UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

RAYNARD VERSATILE CROWE,

        Defendant.

_____/

Criminal Case No. 11-20481

SENIOR U.S. DISTRICT JUDGE
ARTHUR J. TARNOW

## OPINION AND ORDER GRANTING RAYNARD VERSATILE CROWE'S MOTION FOR COMPASSIONATE RELEASE [332]

On November 6, 2020, this Court granted Crowe's Motion for an Indicative Ruling. (ECF No. 331). Pursuant to FED. R. CRIM. P. 37(b) and FED. R. APP. P. 12.1(b), Crowe provided notice to the Sixth Circuit of this Court's Order [331] and requested remand. (ECF No. 332, PageID.4387). On December 1, 2020, the Sixth Circuit granted Crowe's request and remanded the case so that this Court could consider a motion for compassionate release. (ECF No. 333). Crowe filed a Motion for Compassionate Release the same day. (ECF No. 332). The Government responded on December 3, 2020. (ECF No. 334).

The Court's Indicative Ruling [331] predated the Sixth Circuit's recent decision in *United States v. Jones*, No. 20-3701, 2020 WL 6817488 (6th Cir. Nov. 20, 2020), which clarified the applicability of U.S.S.G. § 1B1.13 to defendant-filed

compassionate release petitions such as Crowe's. Pursuant to *Jones*, it is clear that the Court need not have limited its consideration of "extraordinary and compelling circumstances" to those provided by the Sentencing Commission. It is also clear that the Court need not have analyzed Crowe's dangerousness independently of the 18 U.S.C. § 3553(a) factors. Although *Jones* does not change the Court's conclusion that it will **GRANT** Crowe's Motion [322], the Court now sets forth its analysis anew to avoid any confusion.[1]

## BACKGROUND

Crowe was born in Detroit, Michigan in 1981 and was primarily raised by his mother and grandmother. (PSR ¶ 62). Unfortunately, Crowe's childhood was plagued by instability. Crowe switched elementary schools approximately fifteen times, leaving him with behavioral and adjustment issues. (*Id.* ¶ 64). These problems were exacerbated by physical abuse Crowe suffered at the hands of his mother, who whipped him when he got into trouble, as well as mental health issues. (*Id.* ¶¶ 62, 76-77). As a young child, Crowe often turned to his grandmother for support, but

---

[1] The Government argues that *Jones* was decided incorrectly by the Sixth Circuit and that even if the Court follows *Jones*, it should find that "its analysis of § 1B1.13 is not controlling." (ECF No. 334, PageID.4393). As a published Sixth Circuit decision, *Jones* is binding on this Court. Moreover, the Court firmly disagrees with the Government's position that the *Jones* § 1B1.13 analysis is dicta. Even if the Government were correct, however, Crowe would still be entitled to release under the Court's pre-*Jones* understanding of 18 U.S.C. § 3582(c)(1)(A), as set forth in the Court's Indicative Ruling [331] analysis. Accordingly, the Government's new arguments do not change the Court's ultimate conclusion that compassionate release is warranted.

she passed away when he was eight. (*Id.*). By the time Crowe turned twelve, he had started running away from home and was selling and using drugs. (*Id.* ¶ 64).

Crowe's mother is no longer alive today; she passed away in 2005 from an accidental drug overdose. (*Id.* ¶ 63). Crowe's father, whose addiction and incarceration caused him to be absent for much of Crowe's childhood, has now been sober for more than a decade, and the two communicate regularly. (*Id.*). Crowe also remains close with two of his aunts, both of whom live near Detroit. (*Id.* ¶ 68-70).

Crowe has spent the majority of his adult life in custody, starting with his placement in juvenile detention when he was fifteen. (*Id.* ¶ 65). Despite the serious nature of his current charges, his record is relatively short. In 1999, when he was seventeen, Crowe was sentenced to nine to thirty years for armed robbery of a Burger King. (*Id.* ¶ 53). Two years into that sentence, at age nineteen, Crowe got in a fight with a plastic weapon, and his sentence was extended by one to five years. (*Id.* ¶ 54). He was paroled in 2009 and eventually re-incarcerated for the instant offense. (*Id.* ¶ 65). Crowe's participation in the armed robberies for which he was convicted was serious. Crowe planned both the May 8, 2011 bank robbery and the July 11, 2011 pharmacy robbery. (*Id.* ¶¶ 12-20). This included providing weapons and a vehicle, casing the bank, and serving as a lookout during the pharmacy robbery. (*Id.*).

Crowe is currently thirty-nine years old, incarcerated at USP Terre Haute, and scheduled for release on April 30, 2021. *Find an Inmate*, FED. BUREAU PRISONS,

https://www.bop.gov/mobile/find_inmate/index.jsp (BOP Register Number 49984-308) (last visited Dec. 3, 2020).

## ANALYSIS

Section 3582(c)(1) of Title 18 of the U.S. Code, colloquially known as the compassionate release statue, provides, in relevant part:

**(A)**   [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

 **(i)**   extraordinary and compelling reasons warrant such a reduction.

[. . .]

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1).

A. <u>Exhaustion</u>

Before a petitioner moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), they must either exhaust their administrative remedies with the BOP or wait thirty days from when they filed a request with their warden. *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020). On September 21, 2020, after Crowe had been appointed counsel, he submitted to his warden a request for

compassionate release or home confinement. (ECF No. 315-8, PageID.4071). The Government concedes that Crowe has now exhausted his administrative remedies with respect to the two medical conditions he raised in that request: latent tuberculosis and hyperlipidemia. (ECF No. 328, PageID.4321). Accordingly, the Court must now proceed through a three-step inquiry:

> At step one, a court must "find[]" whether "extraordinary and compelling reasons warrant" a sentence reduction. 18 U.S.C. § 3582(c)(1)(A)(i). At step two, a court must "find[]" whether "such a reduction is consistent with *applicable* policy statements issued by the Sentencing Commission." *Id.* § 3582(c)(1)(A) (emphasis added). At step three, "§ 3582(c)[(1)(A)] instructs a court to consider any applicable § 3553(a) factors and determine whether, in its discretion, the reduction authorized by [steps one and two] is warranted in whole or in part under the particular circumstances of the case." [*Dillon v. United States*, 560 U.S. 817, 827 (2010).]

*Jones*, 2020 WL 6817488, at *6 (first four alterations in original) (footnotes omitted).

## B. Extraordinary and Compelling Reasons for Release

"[D]istrict courts have full discretion . . . to determine whether an 'extraordinary and compelling' reason justifies compassionate release when an imprisoned person files a § 3582(c)(1)(A) motion." *Id.* at *7. Here, the Court finds that the risk posed to Crowe from his medical conditions and the spread of COVID-19 at USP Terre Haute constitutes such a reason.

Crowe suffers from latent tuberculosis, a history of hyperlipidemia, and obesity. (ECF No. 314, PageID.3906-07; ECF No. 329, PageID.4345-46). As a

preliminary matter, the Government's issue-exhaustion argument—that the Court can consider latent tuberculosis and hyperlipidemia but cannot consider obesity, which was not raised in Crowe's administrative request—makes no difference to the Court's analysis. Several courts, including this one, have recognized latent tuberculosis as a condition that is alone sufficient to constitute extraordinary and compelling circumstances when coupled with the heightened risk of catching COVID-19 in prison settings. *See, e.g.*, *United States v. Watkins*, No. 15-20333, 2020 U.S. Dist. LEXIS 124937, at *5, 10 (E.D. Mich. July 16, 2020) (granting release despite the fact that the defendant had received treatment); *United States v. Greene*, No. 15-20709, 2020 U.S. Dist. LEXIS 142007, at *7-8 (E.D. Mich. Aug. 10, 2020) (considering and rejecting the Government's argument that the CDC guidelines do not include latent tuberculosis and collecting cases). Thus, while Crowe's alternative arguments would have bolstered the Court's conclusion that extraordinary and compelling circumstances are present, they are hardly necessary.

Like COVID-19, tuberculosis ("TB") typically affects the lungs and is transmitted through airborne droplets. NAT'L CTR. FOR HIV/AIDS, VIRAL HEPATITIS, STD, & TB PREVENTION, TB ELIMINATION: THE DIFFERENCE BETWEEN LATENT TB INFECTION AND TB DISEASE 1 (2011), https://www.cdc.gov/tb/publications/factsheets/general/LTBIandActiveTB.pdf [https://perma.cc/T2A8-JAWV]. A person who has latent TB has been infected by

the TB bacteria, *Mycobacterium tuberculosis*, but has not yet developed full TB. *Id.* About half of those who develop TB do so within two years of being infected. *Id.* This statistic is particularly relevant for Crowe, who was diagnosed and prescribed medication within the last year. (ECF No. 314, PageID.3446). Moreover, as this Court explained in *Watkins*, "[Latent TB] may be a particularly dangerous condition to have in a prison, given that COVID-19 also targets the lungs." 2020 U.S. Dist. LEXIS 124937, at *6; *see also* Padma Nagappan, *COVID-19 Could Activate Latent Tuberculosis*, SDSU NEWSCENTER (Sept. 22, 2020), https://newscenter.sdsu.edu/sdsu_newscenter/news_story.aspx?sid=78173 [https://perma.cc/S2J7-ZHZL].

Crowe's risk is further exacerbated by the current confirmed cases of COVID-19 at USP Terre Haute and the fact that his commissary job requires him to interact with more people than most inmates. (ECF No. 326-2, PageID.4273). At the time of this Court's Indicative Ruling [331], there were three confirmed cases of COVID-19 at USP Terre Haute among inmates and zero confirmed cases among staff. (ECF No. 331, PageID.4376). And as of the time of writing, this number has risen exponentially. *See COVID-19 Coronavirus*, FED. BUREAU PRISONS, https://www.bop.gov/coronavirus/ [https://perma.cc/4W8L-URWA] (last updated Dec. 4, 2020) (listing forty-nine active cases among inmates and three active cases among staff). Moreover, despite the rise in cases around the country, the BOP still

has not provided testing to all inmates at USP Terre Haute. *Compare id.* (973 inmates tested), *with* USP Terre Haute, Fed. Bureau Prisons, https://www.bop.gov/locations/institutions/thp/ [https://perma.cc/4G48-FYR5] (1,241 inmates total). This indifference appears unlikely to abate anytime soon. *See* Michael Balsamo & Michael R. Sisak, *Federal Prisons to Prioritize Staff to Receive Virus Vaccine*, AP News (Nov. 23, 2020), https://apnews.com/article/coronavirus-pandemic-prisons-85361fcf7cda33c7b6afb5ad8d2df8a2 [https://perma.cc/3JMV-8LAJ] (explaining that "initial allotments of the [COVID-19] vaccine will be given to staff and not to inmates, even though sickened prisoners vastly outnumber sickened staff"). Accordingly, the Court reaches the same conclusion here that it did in *Watkins*:

> [R]egardless of whether latent TB can make a person more susceptible to catching COVID-19, if [Crowe] does catch it, the risks to someone with a co-infection of TB and COVID-19 "are readily apparent," as both are respiratory diseases that affect the lungs. The Court is not willing to take that risk.

2020 U.S. Dist. LEXIS 124937, at *6 (first alteration in original) (quoting *United States v. Atwi*, No. 18-20607, 2020 U.S. Dist. LEXIS 68282, at *5 (E.D. Mich. Apr. 20, 2020)).

## C. Applicable Policy Statements

Where, as here, an "incarcerated person[] file[s] [a] motion[] for compassionate release, [the district] judge[] may skip step two of the §

3582(c)(1)(A) inquiry and ha[s] full discretion to define 'extraordinary and compelling' without consulting the policy statement § 1B1.13." *Jones*, 2020 WL 6817488, at \*9. Accordingly, the Court finds that there are extraordinary and compelling reasons for Crowe's release.

    D. Section 3553(a) Factors

    The last step a district court contemplating a motion for compassionate release must take is to consider the applicable sentencing factors listed in 18 U.S.C. § 3553(a). "'[A]s long as the record as a whole demonstrates that the pertinent factors were taken into account by the district court[,]' a district judge need not 'specifically articulat[e]' its analysis of every single § 3553(a) factor." *Id.* at \*11 (quoting *United States v. Curry*, 606 F.3d 323, 330 (6th Cir. 2010)). With that in mind, the § 3553(a) factors are as follows:

    **(a) Factors to be considered in imposing a sentence.** The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
    **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
    **(2)** the need for the sentence imposed—
        **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
        **(B)** to afford adequate deterrence to criminal conduct;
        **(C)** to protect the public from further crimes of the defendant; and

        **(D)**  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

  **(3)**  the kinds of sentences available;

  **(4)**  the kinds of sentence and the sentencing range established for—

        **(A)**  the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

        [. . .]

  **(5)**  any pertinent policy statement—

      [. . .]

  **(6)**  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

  **(7)**  the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). The Court's consideration of these factors is demonstrated both in the analysis below and on the record of the November 3, 2020 hearing.

Crowe's crimes were very serious, however, they were not committed in a vacuum. Crowe has been ensnared in the criminal legal system since the age of fifteen. (PSR ¶ 65). In many ways, the seriousness of the instant offenses reflects the fact that institutionalization from such a young age, rather than providing rehabilitation, often has a criminogenic effect. *See, e.g.*, ANTHONY PETROSINO ET AL., FORMAL SYSTEM PROCESSING OF JUVENILES: EFFECTS ON DELINQUENCY (2010), http://www.njjn.org/uploads/digital-library/resource_1478.pdf [https://perma.cc/ZX8B-86YM]. In any case, Crowe has had nearly a decade in prison to reflect upon the seriousness of his crimes. His accomplishments while incarcerated, combined with his demeanor and testimony at the hearing, persuade

the Court that he has taken that opportunity seriously and that the time he has served has been sufficient to teach him respect for the law.

In terms of the need to protect the public, there is little question that at the time the Court imposed its original sentence in 2013, Crowe posed a danger. While on parole for a violent conviction, Crowe had helped plan and carry out two armed robberies and had failed to meaningfully take responsibility for his conduct. (PSR ¶¶ 12, 14, 20, 23, 29, 42, 53-54). Today, however, Crowe appears in many ways to be a success story for the BOP. At his hearing on November 3, 2020, Crowe persuasively testified as to the extent of his rehabilitation over the last several years. In particular, Crowe's demeanor as he spoke about overcoming his criminal patterns of thinking through the eighteen-month Life Connections Program gives the Court confidence that he has been deterred from future criminal activity.

Although this was not Crowe's first conviction, the Court is mindful that, with the exception of the instant offense, the entirety of Crowe's criminal history stems from convictions he received as a teenager. (PSR ¶¶ 53-54). Given the well-accepted differences between juvenile and adult brains, the Court does not find these prior bad acts to be a reliable barometer of Crowe's danger moving forward. *See, e.g.*, *Graham v. Florida*, 560 U.S. 48, 68 (2010) ("[D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. . . . Juveniles are more capable of change than are adults, and their actions

are less likely to be evidence of 'irretrievably depraved character' than are the actions of adults." (quoting *Roper v. Simmons*, 543 U.S. 551, 570 (2005))).

The Court reaches a similar conclusion with respect to Crowe's PATTERN score. Although the BOP has rated Crowe a "high risk" of recidivism, "this assessment is hardly infallible." *United States v. Rodgers*, No. 11-20481, 2020 U.S. Dist. LEXIS 203475, at *9 (E.D. Mich. Nov. 2, 2020). As this Court has previously noted, the "use of PATTERN [in the context of COVID-19 release decisions] is likely to contribute to significant unjustified racial disparities." *Id.* (quoting P'SHIP ON AI, ALGORITHMIC RISK ASSESSMENT AND COVID-19: WHY PATTERN SHOULD NOT BE USED 1 (2020), https://www.partnershiponai.org/wp-content/uploads/2020/04/Why-PATTERN-Should-Not-Be-Used.pdf [https://perma.cc/2LNP-QXM9]). The Government argues against this conclusion, noting that the BOP "modified PATTERN [following a public commentary period] to ensure its fairness and accuracy." (ECF No. 328, PageID.4333). But the report it cites on the revised PATTERN tool "provides no insight into whether the changes served to decrease disparities." P'SHIP ON AI at 3. Indeed, the PATTERN tool "has yet to be independently validated, as required by the First Step Act." Letter from Jerrold Nadler, Chairman, House Judiciary Comm. & Karen Bass, Chair, Subcomm. on Crime, Terrorism, and Homeland Sec., to William P. Barr, Att'y Gen., U.S. Dep't of Just. (Mar. 30, 2020),

https://judiciary.house.gov/uploadedfiles/3.30.20_letter_to_ag_barr_re_covid19.pdf [https://perma.cc/B7EU-94LB]; *accord* Brandon L. Garrett & Megan Stevenson, *Open Risk Assessment*, 38 BEHAV. SCIS. & L. 279, 280 (2020). Finally, the use of the PATTERN tool appears to be particularly problematic for men of Crowe's age. *See* P'SHIP ON AI at 4 ("Age and criminal history are the most heavily weighed factors in PATTERN score calculation. . . . If a male inmate also has past convictions, he would be unlikely to receive a minimum risk classification [under the revised version of PATTERN] unless he is over the age of 40."). Accordingly, the Court declines to find Crowe dangerous on account of his PATTERN score.

Lastly, while Crowe has had three disciplinary incidents over the last nine years, he has been free of discipline for more than two years. (ECF No. 326-8, PageID.4284). Moreover, Crowe's many accomplishments in prison far outweigh his limited disciplinary record. In addition to Life Connections, the 935-hour residential program that focuses on personal accountability, conflict management, addiction, and morality over the course of eighteen months, Crowe has completed the Drug Education Course, a number of vocational classes, and has been assigned to work in commissary, a position requiring a significant level of trust. *See* (ECF No. 326-2, PageID.4273-74; ECF No. 326-4, PageID.4277; ECF No. 326-5, PageID.4278); MARY M. MITCHELL, FED. BUREAU PRISONS, LIFE CONNECTIONS PROGRAM 3-6 (2013), https://www.bop.gov/policy/om/002_2012.pdf

[https://perma.cc/83FR-KFQA]. These successes, combined with the family support and detailed re-entry plan Crowe testified to at the hearing, persuade the Court that Crowe has been adequately deterred from future criminal conduct and that additional incarceration is not necessary to protect the public.

When the Court resentenced Crowe in September of 2019, it did so with the hope that he would participate in the Residential Drug Abuse Program ("RDAP") prior to completing his sentence. (ECF No. 289, PageID.3193-94). Crowe turned out to be ineligible for RDAP, however, due to his crimes of conviction. Accordingly, the Court finds that there is little to be gained by keeping him in prison for another five months, particularly considering his health conditions and the absence of available programming. The Government argues that, in light of its pending appeal, it is inappropriate for the Court to rely on the fact that Crowe only has five months in prison remaining. But the Government's argument fails to recognize that even if the Sixth Circuit were to reverse the Court's Order [282], compassionate release would still be appropriate under the § 3553(a) factors in light of "the disparity between [Crowe's] 'stacked' sentence and the one he would have received if sentenced after the passage of the First Step Act." *United States v. McClellan*, No. 1:92 CR 268, 2020 U.S. Dist. LEXIS 97136, at *8 (N.D. Ohio June 3, 2020); *see United States v. Alexander*, No. 1:04 CR 529, 2020 U.S. Dist. LEXIS 198264, at *10 (N.D. Ohio Oct. 26, 2020) ("While the change in law is not retroactive, . . . a

sentencing disparity, along with additional factors, may justify compassionate release in certain cases.").

When Crowe appeared before the Court at his first sentencing hearing on June 26, 2013, the Court expressed concern that he had not come close to accepting responsibility:

> It's not often where I make a finding of continuing dangerousness. And until you see the light -- and it may happen in your second year of prison; it may happen in your tenth year of prison -- that you actually have control over these decisions and you have to make the right decisions, you are a danger to the community.

(ECF No. 200, PageID.2029). Now, nearly ten years on, Crowe has undergone dramatic changes. He has accepted responsibility for his crimes, addressed his substance abuse and criminal thinking patterns, and formed a plan to become a productive member of society. In other words, as far as this Court can tell, he appears to have "see[n] the light." (*Id.*). Accordingly, the Court finds that the § 3553(a) factors warrant a sentence reduction to time served.

CONCLUSION

**IT IS ORDERED** that Crowe's Motion for Compassionate Release [332] is **GRANTED** and that his sentence is reduced to time served.

**IT IS FURTHER ORDERED** that Crowe be **IMMEDIATELY RELEASED** to begin his three-year term of **SUPERVISED RELEASE**, as

outlined by the September 23, 2019 Judgment (ECF No. 288, PageID.3152),

including the following additional Special Conditions:

> **The defendant shall undergo a strict fourteen-day quarantine upon his release and shall fully comply with any applicable state or local stay-at-home orders, social distancing guidelines, or other public health restrictions.**
>
> **SO ORDERED**.

<br>

s/Arthur J. Tarnow
Arthur J. Tarnow

Dated: December 7, 2020       Senior United States District Judge